W. J. SAVAGE, et al., v. SOUTH KNOXVILLE MACADAM CO., et al.

Eastern Section. November 13, 1926.

Petition for Certiorari denied by Supreme Court, July 15, 1927.

1. **Municipal corporations. Where contract is terminable by the city at pleasure it can not be construed as a contract for over $500.**

    In an action by certain tax payers to recover money paid by the city to an asphalt company on the ground that the contract was for more than $500 and had not been let publicly as required by statute where the evidence showed that there was no contract with the asphalt company but that the city bought in the nature of a running account from day to day, held that where the contract is for service continuous in its character, but terminable at the pleasure of the public body, the mere fact that it may be continued so long as to cost in the aggregate more than the amount limited by statute, for contracts let without competition, will not bring it within the statute. The statute was intended to apply to contracts for particular jobs involving liability to pay such amount, not to services for an indefinite period involving no obligation to continue the service.

2. **Municipal corporations. City of Knoxville has right under its charter to repair streets.**

    Held that the city of Knoxville under the Act of 1911 and particularly, sections 11, 18, 19 and 20, had power in the hands of the commissioners to carry on the business of the city, including the improvement and repair of streets, and of the doing of the work themselves.

3. **Municipal corporations. There is no personal liability on municipal officers unless their discretion is fraudulently or corruptibly exercised.**

    Where the evidence showed that the municipal officers might have obtained certain repairs cheaper than the price actually paid and the evidence further showed that the discretion of the officers had not been corruptibly or fraudulently exercised, held that there was no personal liability upon the officers because of the higher price paid.

Appeal from Chancery Court, Knox County; Hon. Chas. Hays Brown, Chancellor.

Decree of Chancellor Affirmed.

Webb, Baker & Egerton and Fowler & Fowler, of Knoxville, for appellant.

Chas. T. Cates and John W. Green, of Knoxville, for appellee.

SNODGRASS, J. This bill was filed April 12, 1923, by complainants, Savage and others, as taxpayers of the City of Knoxville, who brought it on behalf of themselves and all other taxpayers, against the South Knoxville Macadam Company, a corporation; against E. W. Neal, N. B. Kuhlman, C. J. Wayland, D. Neal Adams and J. B. McCalla, who were commissioners of the City of Knoxville, constituting its governing authority; against the Southern Surety Company, National Surety Company, Fidelity & Deposit Company of Maryland, American Surety Company, and New Amsterdam Casualty Company, bondsmen of the said commissioners; and also against the City of Knoxville itself, as a municipality situated in Knox county, Tennessee. The object of the bill was to recover of the defendant corporation large sums alleged to have been paid to it by the city commissioners upon alleged illegal contracts made with it for macadam delivered upon the streets, and also to hold the commissioners and their bondsmen personally liable for the amounts so paid out; the city being made party also under the idea that its officers, being charged with the delinquency that brought about the trouble, and being personally liable, could not be entrusted with the duty of conducting the suit against themselves, which involved a situation authorizing the suit without any preliminary formality. It was alleged that the said commissioners constituted the board of commissioners of the City of Knoxville, having been elected as such in September, 1919, and that thereafter they duly and seasonably qualified and entered upon the discharge of their duties on the fourth Saturday in September, 1919, serving as commissioners since that time; that the said E. W. Neal was mayor, and assigned to the Department of Public Affairs; that the said C. G. Wayland was assigned to the Department of Accounts and Finance; N. B. Kuhlman to the Department of Public Safety; J. B. McCalla to the Department of Streets and Public Improvements; and Neal Adams to the Department of Parks and Public Property. It was alleged that the liability asserted against these individuals composing the board of commissioners aforesaid, arose by reason of their failure and refusal to perform the duties imposed upon them by law, as well as misfeasance in the performance thereof; . . . that the South Knoxville Macadam Company was engaged in the business of quarrying, crushing, selling and delivering crushed rock and maca-

dam, and making and repairing streets therewith; that the Southern Surety Company is surety on the official bond of Mayor E. W. Neal, in the penal sum of $10,000.00; that the said Surety Company is surety on the official bond of said C. G. Wayland, in the penal sum of $25,000; that the said National Surety Company and American Surety Company are sureties on the official bond of the said Nathan B. Kuhlman, in the penal sum of $10,000 each; that the said Fidelity & Deposit Company of Maryland is surety on the official bond of the defendant J. B. McCalla in the penal sum of $10,000; and that the said New Amsterdam Casualty Company is surety on the official bond of the defendant D. Neal Adams; that each of said bonds guaranteed to the City of Knoxville the faithful performance of the duties imposed by law upon the respective officials appearing thereon as maker and principal, and that each bond is in full force and effect since the qualification of the commissioners as aforesaid, and that each of the sureties had become liable to the City of Knoxville by reason of the failure of the makers and principals of said bonds to fulfill the duties imposed upon them by law, and had become liable for all the acts of nonfeasance and misfeasance of their respective principals.

It was further alleged that the City of Knoxville is a municipal corporation existing by virtue of chapter 207 of the acts of the General Assembly of the State of Tennessee for the year 1907, and acts amendatory thereof; that under the terms of chapter 207 of the Acts of 1907 the government of the City of Knoxville was conducted by a board of mayor and aldermen and by a board of public works, and that said chapter 207 provides, among other things, as follows:

"Section 38: Be it further enacted, that in all cases where the estimated cost of expenditure exceeds $500 the board (of public works) shall submit to the board of mayor and aldermen of said city with their recommendations an ordinance authorizing the said expenditure with an estimate of said cost."

"Section 39: Be it further enacted, that upon the passage by the mayor and aldermen of such ordinance, it shall be the duty of the board of public works to advertise and let such work to the lowest bidder."

And also, by amendment, the following:

"Section 48: Be it further enacted, that the board shall publish all resolutions declaring the necessity for improvements or expenditures over $500 but an ordinance authorizing such improvements or expenditures over $500 must be passed by the board of mayor and aldermen on the recommendation

of the board of public works before the work is done and the expenditure can be authorized.''

It was alleged that by chapter 498 of the acts of the General Assembly of the State of Tennessee for the year 1911 the form of government was changed from a government by board of mayor and aldermen to a board of five commissioners; that by said Act of 1911 all the powers and duties conferred upon the board of mayor and aldermen and the board of public works by chapter 207 of the Acts of 1907 were conferred upon the said board of five commissioners, and that said commissioners were required by said act to do the things prescribed to be done by the board of mayor and aldermen and the board of public works by sections 38 and 39, etc., of chapter 207 of the Acts of 1907. It was then by the bill and amended bill substantially charged that it accordingly became the duty of said board of commissioners composed of said defendants, in all cases where any expenditure would exceed $500, to pass an ordinance authorizing such expenditure, with an estimate of the amount, and after due passage of said ordinance to advertise and let such work to the lowest responsible bidder; it being alleged that the purpose of said act was to give to said municipality the advantage of competitive bidding; that notwithstanding the provisions of the charter aforesaid the defendant commissioners, without complying therewith, entered into an agreement and understanding with the South Knoxville Macadam Company and Crippen Construction Company whereby it was agreed that a large proportion, practically all of the contracts for and repairing of the macadamized streets in the City of Knoxville should be let to said construction companies, and in keeping with said understanding that an agreement was entered into whereby said city would enter into a contract with said construction companies to repair and construct said streets, and to furnish material with which to do so, and as a result thereof that the defendant commissioners have paid to the Crippen Construction Company the sum of $139,589.79, and to the South Knoxville Macadam Company the sum of $149,112.60; that it was agreed with the Crippen Construction Company that the City of Knoxville would pay to it a stated price per yard for rock at the plant of said company, and would pay in addition thereto for hauling, spreading and rolling said rock upon the different streets. Certain other averments were had with reference to the Crippen Construction Company, among which were that in hauling part of said macadam from the plant of the Crippen Construction Company certain trucks of the defendants R. E. Lee and Frank Mynatt were used; that both of these individuals were officials of said city, said R. E. Lee being superintendent of streets and the said Frank Mynatt being superintendent of garbage, and it was averred upon

information and belief that although it was unlawful for the superintendent of streets to (be interested in this contract, that the said commissioners knew said Mynatt and Lee were to participate therein, and that it was for this reason that others were not given the privilege of bidding upon said work; and it was averred on information and belief that excessive amounts were thus paid to said Mynatt and Lee, which in part accounts for the high average cost per cubic yard for said macadam.

It is proper to state that upon a demurrer for misjoinder of parties the case against the Crippen Construction Company was separated from this cause and is proceeding independently, and it is not necessary to notice it. But with reference to this cause it was averred that the agreement entered into between the defendant commissioners on behalf of the City of Knoxville with the defendant South Knoxville Macadam Company was, that said Macadam Company would supply to the City of Knoxville macadam delivered on the streets of said city. It was averred that the average price paid by the City of Knoxville to said South Knoxville Macadam Company per cubic yard was $3.62, whereas a fair, reasonable and market price therefor was $2.50 per cubic yard. It was averred that 38,417 cubic yards of macadam was furnished by said South Knoxville Macadam Company at an average price of $1.12 per cubic yard in excess of the fair, reasonable and market value thereof, and that the City of Knoxville had been damaged in the sum of $43,027.04 by reason of the failure of the said defendant commissioners to comply with the provisions of the charter aforesaid; and it was averred that there were other concerns who would have furnished and delivered said materials at the average price of $2.50 per cubic yard aforesaid; that the South Knoxville Macadam Company well knew of the failure of the defendant commissioners to comply with said provisions of the charter. Accordingly it was averred that complainants were advised, and therefore averred that said defendant commissioners and said South Knoxville Macadam Company were liable to them and all other taxpayers in the sum of $43,027.04. It appears, therefore, with reference to the defendant, the South Knoxville Macadam Company that there is no charge of fraud or bad faith other than that it knew that the commissioners had violated the charter in their alleged contract with it, placing its liability upon this ground, and the liability of the commissioners as predicated upon the alleged negligence and violation of the charter.

The answer of the South Knoxville Macadam Company denied that complainants were entitled to maintain the bill. It was admitted that the commissioners named had duly qualified and were properly designated as assigned, and that they had entered upon

the discharge of their duties as board of commissioners of the City of Knoxville. It was denied that they had been derelict in the discharge of their duties as alleged, or that they had been guilty of nonfeasance or misfeasance in office as alleged by complainants, and strict proof was demanded. It was admitted that defendant was a corporation and had been engaged for several years in the business of quarrying, crushing, selling and delivering rock and macadam, to be used not only in the building, repairing and constructing of streets in the City of Knoxville, but to be used by the public generally, or such persons, firms or corporations needing rock or macadam to whom respondent had been able to sell or furnish such rock or macadam. It was admitted that the City of Knoxville is a municipal corporation, chartered and organized under the laws of the State of Tennessee, but it was denied that the provisions of chapter 207 of the Acts of 1907 quoted in the second paragraph of the bill have been in force, as respondent is advised, at any time during the term respondent was engaged in selling crushed rock or macadam to the City of Knoxville as hereinafter shown. And it was further denied that the aforesaid provisions of the Act of 1907, chapter 207, quoted in the second paragraph of the bill, in any way controlled or were binding upon the commissioners of the City of Knoxville in their relations with this respondent, whereby at different times and in different amounts the City of Knoxville, through said commissioners, purchased crushed rock or macadam from this respondent. And further answering respondent denied that it was the duty of the defendant commissioners of Knoxville, in all cases where any expenditure would exceed the sum of $500, to pass an ordinance authorizing such expenditure, as alleged in the second paragraph of the bill. It was denied that the defendant city commissioners entered into an agreement with it whereby said commissioners agreed that a large portion or practically all of the contracts for repairing of the macadamized streets of the City of Knoxville should be let to it alone, or to it and the Crippen Construction Company. It was averred that respondent did not know what sort of a contract existed between the defendant commissioners and the Crippen Construction Company; that it was not concerned therewith, and attention was called to the fact that it was not even charged in the bill that it was interested in any contract between the City of Knoxville and the defendant Crippen Construction Company, or that it had anything to do with the execution of any contract which may have existed between the City of Knoxville and the defendant Crippen Construction Company. It was denied that it at any time entered into an agreement or contract with the City of Knoxville or the defendant commissioners of the City of Knoxville for the purpose of repairing or

constructing streets for the City of Knoxville, and it was averred that the transactions between it and the City of Knoxville consisted in sales by this respondent to the City of Knoxville of different amounts of crushed rock or macadam, at different times, as and when the City of Knoxville ordered or desired to purchase same from this respondent.

Respondent denied the allegations contained in the third paragraph of the bill to the effect that it had sold to the defendant commissioners 38,417 cubic yards of macadam for $149,112.60, and it was averred that, if not mistaken in its calculations as to the actual amount of macadam sold and delivered by it to the City of Knoxville during the term of office of the defendant commissioners, it sold and delivered to the said City of Knoxville about 40,859 cubic yards of macadam, at the price of $146,724.86; that if an error should hereafter be found, it was stated that leave of the court would be asked to correct it. It was thereupon averred that complainants were wholly mistaken in their allegation to the effect that it had a contract with the City of Knoxville for any specific amount of macadam, but it was averred that respondent, as a manufacturer of macadam, was in the market to sell its crushed rock or macadam to whomsoever needed it or was in a position to purchase such crushed rock or macadam. It was further averred that the deals between it and the City of Knoxville were in all respects similar to its dealings with its other customers; that the prices charged by respondent to the City of Knoxville were the same prices charged by it to its other customers, without discrimination in favor of one customer over another; that in the course of its business respondent had a fixed charge for crushed rock or macadam delivered to a customer at the place of crushing or manufacture, but when the customers of respondent were unable to transport the macadam purchased by them from the place of manufacture to the place where it was to be used, and desired respondent to deliver the said crushed rock or macadam to the place where it was needed or used, respondent added to the price at the place of manufacture a reasonable and proper charge for delivering said crushed rock or macadam, and the price or charge for delivering by respondent was uniform to all its customers, including not only the City of Knoxville, but the County of Knox and other large users of crushed rock or macadam. It was further averred that it never had any specific agreement or contract with the City of Knoxville to furnish any specific or particular amount of macadam, but that the course of its dealings with the City of Knoxville was in substance as follows:

"When said City of Knoxville needed macadam in the construction, building or repairing of its streets it would, from time to time, order certain amounts of macadam from respondent and a part

of the amount so ordered by said City of Knoxville was furnished by respondent at its bins or place of manufacture to the trucks or wagons of said City of Knoxville; but the greater part of said macadam furnished by respondent to the City of Knoxville was by and upon the request of proper officials of the said City of Knoxville delivered by respondent to the place where such macadam was needed or was used by said City of Knoxville; and in this connection it is proper to show unto your Honor that large amounts of said macadam so furnished by respondent to the City of Knoxville, were by respondent delivered to the City of Knoxville at places from four to six and seven miles distant from respondent's place of business.

"Respondent shows and avers that its dealings with the City of Knoxville were fair, honest and above-board and its charges for furnishing and delivering macadam to the City of Knoxville were reasonable and were the same charges made by it to the public generally; and respondent denies and denounces as unfair and unjust the allegation of complainants in the third paragraph of their bill to the effect that it furnished and delivered macadam to the City of Knoxville at an average price of $1.12 per cubic yard, or any other amount, in excess of the fair, reasonable and market value thereof; and respondent denounces said allegation as recklessly made by complainants and respondent believes that neither of the complainants will have the hardihood to become a witness and testify to the false, scandalous and reckless charges made by them against this respondent.

"Respondent denies that it has been paid the sum of $43,027.04 more than it was entitled to by reason of the failure of the defendant commissioners to comply with the provisions of the charter of the City of Knoxville; and it denies the allegations contained in the third paragraph of the bill that it knew that the defendant commissioners were failing to comply with the provisions of the charter of the City of Knoxville in their dealings with this respondent.

"Respondent further denies the allegation contained in the third paragraph of said bill that it is liable or indebted either to the City of Knoxville or complainants or taxpayers of the City of Knoxville $43,027.04, or any other sum; on the contrary, the City of Knoxville is indebted to this respondent as will be shown when the facts in respect thereto become material.

"IV. And further answering said bill respondent shows unto your Honor that in its dealings with the defendant commissioners of the City of Knoxville, it was actuated by the utmost good faith— that it desired to sell its macadam at the market price and value thereof and that it honored requisitions and orders by defendant commissioners of the City of Knoxville in furnishing and delivering

macadam to the City of Knoxville for its just and proper uses in the same way and at the same price it sold and delivered macadam to the public generally; and that its dealings with the City of Knoxville have in all respects been fair and honest and that all of its said dealings referred to in the third paragraph of the original bill have been approved by the proper officials of the City of Knoxville and payment thereon made to respondent so that these matters are closed and complainants are estopped from challenging the same.

"V. Respondent denies that it is indebted to the City of Knoxville or to the complainants in any sum.

"VI. All other allegations of complainants' bill not hereinbefore specifically admitted or denied are here and now generally denied and strict proof thereof demanded."

The remaining statement of the case, taken from appellant's brief, is as follows:

"The answers of the defendant commissioners are perhaps sufficiently broad to enable them to rely upon all of the defenses brought forward by the South Knoxville Macadam Company, except that they did not plead that the transactions were closed, and that the complainants were estopped to prosecute this case.

"It was averred in the answers of the commissioners other than J. B. McCalla that the government of the City of Knoxville was departmental, being divided into five departments, viz: Department of Public Safety, Department of Public Affairs, Department of Accounts and Finance, Department of Streets and Public Improvements and Department of Parks and Public Property. It was alleged that the immediate control and supervision of the Department of Streets and Public Improvements had been assigned to the defendant, J. B. McCalla, and that in no event could any commissioner other than he be held liable for the matters alleged in the original bill.

"The surety companies were sued because of their having become surety upon the official bonds of the defendant commissioners relied upon practically the same defenses as did the commissioners, but brought forward the additional defense that they had been sued in other cases, and that in no event could their total liability be more than the principal amount of their respective bonds.

"During the progress of the case, the defendant commissioner C. G. Wayland having died, the cause was revived against Mrs. Sarah Wayland as administratrix of his estate.

"During the progress of the case the City of Knoxville filed an intervening petition alleging that it had been made a formal party defendant to the original bill; that since that time its government had passed into the hands of a council pursuant to the Private Acts

of the Legislature of Tennessee for the year 1923, chapter 412, and that it now sought to become a party complainant. A resolution was attached to the petition, it having been duly passed by said council of said city.

"The Chancellor denied the right of the City of Knoxville to become a party complainant."

Proof was taken and the cause heard before the Chancellor, who entered the following decree:

"This cause came on to be heard on this the 11th day of April, 1925, before the Hon. Chas. Hays Brown, Chancellor, upon the record at large and the court being of opinion that the allegations of the bill are fully met by the answers of the several defendants and are not sustained by the proof, it is so ordered, adjudged and decreed.

"And it appearing to the court that there was no contract between the City of Knoxville and the defendant South Knoxville Macadam Company for the furnishing of any particular amount of macadam, but that the purchases by the City of Knoxville of macadam furnished it by the said defendant South Knoxville Macadam Company were upon separate orders, each for an amount less in value than $500, although when the bills for a number of such orders were aggregated, they amounted to more than $500; and that said macadam so furnished to the City of Knoxville was furnished by the defendant South Knoxville Macadam Company for the price at which it sold macadam to the public generally and that the price paid by the City of Knoxville was fair and reasonable, and that the City of Knoxville received full value for the macadam purchased by it from the defendant South Knoxville Macadam Company—it is further ordered, adjudged and decreed. And it is further ordered, adjudged and decreed that complainants are not entitled to the relief sought by them against the defendants, and their bill is hereby dismissed, and complainants with Fowler & Fowler and Webb, Baker & Egerton, surety on their prosecution bond, will pay all the costs of this cause, for which execution may issue.

"On the hearing there were a number of exceptions to the testimony by both parties and if either party desired to continue such exceptions and rely thereon, the action of the court upon each and every exception can be shown by a bill of exceptions to be filed within thirty days from this date.

"To the foregoing holdings and actions of the court the complainants except, and from the decree dismissing their bill complainants pray an appeal to the next term of the Supreme Court at Knoxville, Tennessee, which appeal is granted upon complainants giving an appeal bond with proper sureties, and ten days are allowed within which to execute such appeal bond."

Complainants perfected their appeal, and have assigned errors as follows:

"1. The chancery court was in error in denying complainants a recovery for and in behalf of themselves and all other taxpayers of the City of Knoxville against defendant South Knoxville Macadam Company, the defendant commissioners E. W. Neal, N. B. Kuhlman, J. Boyd McCalla, D. Neal Adams and Sarah Wayland, administratrix of the estate of C. G. Wayland, deceased, and the defendant surety companis which were sureties upon the bonds of the different commissioners in an amount equal to the difference between the fair market value of certain macadam delivered by the South Knoxville Macadam Company on the streets of the City of Knoxville, and the amount actually paid the defendant South Knoxville Macadam Company therefor. The number of cubic yards, the amount paid per cubic yard and the total amounts paid which the Chancellor should have held to be excessive and should have granted complainants a recovery thereon are as follows, to-wit:

| | | | |
|---|---|---|---|
| 2341 | cubic yards | @ 2.75 | 6,437.75 |
| 2661.5 | " " | @ 3.00 | 7,984.50 |
| 1177 | " " | @ 3.25 | 3,825.25 |
| 18,292.16 | " " | @ 3.50 | 64,022.58 |
| 370 | " " | @ 3.75 | 1,387.50 |
| 10,496 | " " | @ 4.00 | 41,984.00 |
| 1,778.33 | " " | @ 4.25 | 7,557.92 |
| 1,301 | " " | @ 4.50 | 5,854.50 |

"The number of cubic yards aforesaid was 38,417, for which the City of Knoxville paid to the South Knoxville Macadam Company the sum of $139,054, making an average cost per cubic yard delivered on the various streets $3.61, whereas, the reasonable fair market value of this macadam delivered on the various streets was $3 per cubic yard; and inasmuch as said contracts were let illegally the Chancellor should have granted a recovery of $ .61 per cubic yard (being the amount of loss to the City of Knoxville), making a total recovery which the Chancellor should have awarded against said defendants, of $23,373.37."

"2. The chancery court was in error in failing to award a recovery on behalf of complainants against commissioners E. W. Neal, N. B. Kuhlman, D. Neal Adams and J. B. McCalla, and against Sarah Wayland, executrix of the estate of C. G. Wayland, deceased, and against the surety companies heretofore named, who were sureties upon the official bonds of said commissioners and upon the official bonds of C. G. Wayland, deceased, and against the South Knoxville Macadam Company for the difference between the prices paid to the South Knoxville Macadam Company and the fair market value of macadam furnished and delivered by the South Knoxville

Macadam Company upon the following streets, to-wit: Blount, Boyd's Bridge Road, Boyd's Road and Chestnut, Broad, Butler, Campbell, Castle, Central, Charles, Chestnut, Clinton, Clinton and Middlebrook Pike, Depot, East 5th and Spence, East Turnpike Road, Eleanor, Florida, Front and Central Streets, Georgia, Grainger, Gratz, Henderson, Hill, Hume, Island Home Pike, Jackson, Lake, Lenoir, Lowe's Ferry Road and Kingston, Luttrell, Main, Marion, Martin Mill Pike, Maryville Pike, Middlebrook Pike, Nelson, Pennsylvania and Prosser Road, Ramsey, Sevierville Pike, 6th, Spence street, Surrey, Vine, Washington avenue, Washington Pike, West View. While complainants insist that the macadam was furnished by the South Knoxville Macadam Company to the City of Knoxville under one continuous contract, yet if the court find that this be not true, then complainants rely upon the erroneous action of the Chancellor in failing to award recoveries upon contracts involving more than $500 which are in this assignment specifically referred to; that is, defendant South Knoxville Macadam Company was paid more than $500 for furnishing macadam upon each of the streets just named, which contracts were let illegally in that no estimate of the cost was made theretofore, nor an ordinance passed, nor were said contracts let at public bidding, and accordingly, the Chancellor was in error in failing to award complainants a recovery against the defendants for the difference between the fair market value of the macadam furnished and delivered upon the streets aforesaid, and the price actually paid therefor. The city paid for the macadam aforesaid $127,045.48, which was $20,658.71 in excess of market value."

"3. The chancery court was in error in sustaining the objection of the defendants to all parts of the deposition of Alexander Harris dealing with prices for macadam paid by him as acting city engineer since October 8, 1923, the questions and answers being as follows:

" 'Q. What did it cost you per yard for that rock on the Middlebrook Pike? A. The Middlebrook Pike?

" 'Q. Including all the expense in the purchase of the rock, freight, unloading, total cost? A. The total cost of the Middlebrook Pike averaged $2.75.

" 'Q. $2.75 per yard? A. Yes sir.

" 'Q. What was the total price on Sutherland avenue? A. Sutherland avenue, $2.80.

" 'Q. What was the total price per yard on the Clinton Pike? A. The Clinton Pike, $2.80.

" 'Q. That means rolled in place? A. That means rolled in place per cubic yard.' "

"4. The chancery court was in error in denying the right of the City of Knoxville to become a party complainant in this cause.

Originally, the City of Knoxville was made a formal party defendant, but thereafter the administration having changed, it sought by petition to become a party complainant, its right to do so being denied, which was error on the part of the Chancellor.''

Taking up the question first as to the liability of the South Knoxville Macadam Company, the allegations of the bill are not sustained. It did not have the character of contract with the commissioners that is alleged in the bill. It simply sold macadam to the city on account, as claimed by it in its answer, and while it sold some macadam delivered at the bins, it sold a large amount delivered on the streets of Knoxville, at places designated by the city, and where the city itself was carrying on the work of repairing and improving its streets. Were it material to do so, we can not say from the proof that its prices were unreasonable or excessive for the character of macadam it was furnishing, the very best obtainable, and considering also the various distances it was hauled, though it appears from the proof that had the city advertised for bidders it could have had furnished, to a number of the streets at least, crushed stone much cheaper than because of the long haul the defendant South Knoxville Macadam Company was furnishing it. With reference to this company, however, there is no allegation of fraud, and none proven had such been alleged.

If then, under the charter the city had the right to buy this macadam from the defendant in the manner and form it so purpurchased it, then it should pay for it according to contract. There was no purchase from this company at any one time of an amount of macadam equalling $500, but the transactions ran on from day to day for several years. Not that the city had made any contract by which it was obliged to purchase the stone used through any particular time or for any particular street or streets, upon which it might be said that any obligation exceeding $500 was contracted, but much the same as one would contract on account with his grocer from day to day, which could be discontinued at any time and settled for on any date that might be convenient or desirable. Each purchase, therefore, was a separate transaction, and it is not material as to how the accounts were kept or as to what aggregate they might exhibit, either collectively or as the account or accounts were kept for any particular street or streets. In this regard it is proper to say that the city might have paid off its account at any time and have stopped the expenditure at any wagon or truckload, or have changed it to another patronage, without incurring any liability for any breach that might be asserted. It is therefore manifest that the sections of chapter 207 of the Acts of 1907 relied upon by the complainants do not apply. Even if said sections now constitute a part of the city's charter, ''where the

contract is for service continuous in its character, but terminable at the pleasure of the public body, the mere fact that it may be continued so long as to cost in the aggregate more than the amount limited by statute, for contracts let without competition, will not bring it within the statute. The statute was intended to apply to contracts for particular jobs involving liability to pay such amount, not to services for an indefinite period involving no obligation to continue the service." Donnelly Law of Public Contracts, pp. 206-207.

Mr. Donnelly is also cited as approving the cases of Swift v. Mayor, 83 N. Y. 528-537, and People v. Kane, 161 N. Y. 380, where it was in effect held that when the employment or agreement is terminable at pleasure, and there is no obligation to continue the agreement for labor or materials, the fact that such agreement might be continued to exceed the money limit placed upon non-competitive contracts, will not bring it within the terms of the statute requiring competition.

But the question is, did the city have the right under its charter to itself improve or repair its streets or, in other words, to purchase the material and employ the force to do the work under its own immediate supervision and control? If it had such discretion and power, even though it may have purchased some of the material to be delivered at certain places which came at a price higher because of the long haul than it might have cost had the material for that particular place been purchased from a source more near and available, yet nevertheless, without fraud, its officers conducting said improvements would not be responsible for errors of judgment that may have occasioned the city a loss.

"As a general rule city officers are not individually liable for the improper exercise of their discretionary power." Thompson's Com. on the Law of Negligence, Vol. 8, sections 5818-5839; Brown v. Bentonville, 94 Ark., 80, 126 S. W., 93; Voorhees v. Collins, 149 App. Div., 828, N. Y. S. 85.

We think that a careful examination of said Act of 1911 will disclose such power. The old charter existing under chapter 207 of the Acts of 1907 created, as stated, a bicameral body, consisting of a board of public works and a board of mayor and aldermen. There was a divided responsibility, and certain duties or powers to be exercised by each. For instance, as to contracts, it was provided by section 37 "that when the board of public works deems it advisable to make a contract for the execution of any work or purchase of any material for matters under its charge, a careful estimate was to be made of the cost of such work or material."

"Section 38: That in all cases where the estimated cost of expenditure exceeds $500, the board shall transmit to the board of

mayor and aldermen of said city, with their recommendation, an ordinance authorizing said expenditure, with an estimate of the cost.''

''Section 39: That upon the passage by the board of mayor and aldermen of such ordinance, it shall be the duty of the board of public works to advertise and let such work to the lowest responsible bidder.''

''Section 40: That all contracts of the board of public works may be made in the name of the mayor and aldermen of Knoxville, and executed in behalf of said mayor and aldermen by the presiding officer of the board, under the seal of the corporation, and filed in the office of the recorder.''

Then followed sections 41, 42, 43, 44, 45, 46 and 47, providing that no member can incur debts; authorizing increase of tax levy; against nepotism; providing for sworn accounts, etc., etc; as to change of plans; for extra work; and then section 48, which provides:

''That the board (meaning board of public works) shall publish all resolutions declaring the necessity of the improvements and expenditures over $500; but an ordinance authorizing such improvements or expenditures over $500 must be passed by the board of mayor and aldermen, on the recommendation of the board of public works, before the work is done and the expenditures can be authorized.''

The Act of 1911, though it was passed as an amendment to chapter 207 of the Act of 1907, created a new city government, devolving the powers that had been exercised formerly upon a single entity known as the board of commissioners of the City of Knoxville, which it was provided should consist of a mayor and four commissioners, and it was provided that said board of commissioners shall have and possess, and its members shall exercise, from and after the election and qualification of the first board of commissioners provided for in the act, all executive, administrative, legislative and judicial powers now had, possessed and exercised jointly and severally by the mayor, the board of mayor and aldermen, the board of public works, the board of health, the board of park commissioners, the board of water works commissioners, the board of governors of the Knoxville General Hospital, the city comptroller, the city engineer, and the executive and administrative officers of said city subject to the provisions of this act; and the office of mayor, except as herein provided, the board of mayor and aldermen, the board of public works, the board of health, the board of water works commissioners, the board of park commissioners, the board of governors of the Knoxville General Hospital, city comptroller and city engineer of said city were all abolished, to take

effect upon the election and qualification of the first board of commissioners under this act. While section 40 provided that all provisions of the present charter of the City of Knoxville and the acts amendatory thereof not in conflict with this amendatory act be continued in full force and effect, it is believed that if the abolition of the offices did not carry with it every special provision in relation to the manner of how the duties of their offices were to be performed, among which are the sections quoted, there is nothing in the act that would prevent the city from purchasing stone or macadam and repairing its own streets, without the necessity of letting such work out to the lowest bidder.

Section 17 of the new Act (1911) provides that the executive and administrative power, authority and duties in said city, shall be distributed into and among five departments, as follows: (1) department of public affairs; (2) department of accounts; (3) department of public safety; (4) department of streets and public improvements; (5) department of parks and public property; and provided that the board of commissioners shall determine the powers and duties to be performed by and assign them to the appropriate department; shall prescribe the powers and duties of officers and employees; may assign particular officers and employees to one or more of the departments; may require an officer or employee to perform duty in two or more departments; and may make such other rules and regulations as may be necessary or proper for the efficient and economical conduct of the business of the city.

It is believed that these and other sections of the Act of 1911, notably sections 11, 18, 19 and 20, place plenary power in the hands of the commissioners to carry on the business of the city, including the improvement and repair of streets, and of the doing of the work themselves, providing for publicity with reference to receipts and disbursements, and punishing any unfaithful officer with liability to recall, etc., etc.

It appears that the board placed the improvement of the streets under the department of streets presided over by Commissioner McCalla, with power to make the improvements, such as were made upon the streets in the present case; and while it does appear that upon certain streets if advertisement had been made macadam could have been placed cheaper, taken as a whole it is by no means certain that it could have been done better or more expeditiously or efficiently, which were matters to be considered in the exercise of a sound discretion; nor does it follow from this that the discretion was fraudulently or corruptly exercised, had such been the charge.

There was no question made but what the defendant South Knoxville Macadam Company was a strong concern and able to furnish macadam in quantity and of the best quality, and suitable for the purposes of the city; and that there was another concern, the Crippen Construction Company, likewise equipped; and while the proof shows that there was a small number of other concerns that would have bid at least on certain portions of the work, and for such portions have sold the stone delivered cheaper, and that the city might itself have opened quarries, or by advertisement have possibly induced others to open quarries, and thus might have gotten the work done cheaper, at least in certain places, yet it appears that the city was forced to issue certificates of indebtedness in large sums to carry on the work, and that this defendant, the South Knoxville Macadam Company, was able to and did carry this indebtedness, thus accommodating the necessities of the city in expediting the repairs and improvements, while it does not appear that any of the others said to be available could or would have done so, while it does appear that at least one or more of them could not have done so. Indeed it was demonstrated that as to one of the largest available competitive sources pointed out, that of the Holston Quarry Company, it would have had to ship in its rock and have delivered the same on cars, when, considering freight rates, cost of unloading into trucks and the haul and distribution to places desired, it would have made it cost quite as much or more, with perhaps (as it was marble) not as desirable a product as the limestone. Moreover this company would have had to make preparation to furnish stone in large quantities to the city, and at the same time accomodate its other customers. So that, taken as a whole, we cannot say from all this the city has not received full value for the work that has been performed for which it is claimed the city has sustained large losses.

We think, however, that if section 37, 38, 39 and 45 of the old charter of 1907 are a part of the new charter, that they do not relate to such repairs or improvements as are done directly by the city itself, but to such as might be determined by the commissioners to be done under contract, or as to purchases which exceed as a single entity the sum of $500; and that under section 17 of the new charter it is given to the board of commissioners to determine the powers and duties to be performed by and assign them to the appropriate department, under which, in their discretion, they may commit the improvement of the streets to the department of streets, and may make such other rules and regulations as may be necessary or proper for the efficient and economical conduct of the business of the city, and that therefore any provision of either of those sections that would interfere with the exercise of this dis-

cretion would not be continued, as the duties evidenced by said sections were nowhere specifically devolved upon the commissioners, and only such parts of the old charter as were not in conflict with the new were continued. We think, therefore, that these sections could not be regarded as limiting any powers or discretion enacted in the new charter of 1911, and that therefore these improvements conducted by the city have not been shown to be in violation of law.

In the absence of allegations and proof as to a corrupt exercise of these powers, officers of the city and their bondsmen could not be held responsible for any bad judgment simply that may have attended their efforts which involved the city in losses. In this view of the case we have not deemed it necessary to discuss other questions made in the brief, except that we deem it proper to say we think, had this been a case of letting out these contracts in violation of law, that while the city or taxpayers would not be aided to recover any sum for which the city had received full value, yet we think the Commissioners and their bondsmen would have been liable for any excess above what such services or material was reasonably worth at the time, and that, barring the question of ratification, no question of estoppel would have operated to prevent this result. However, if the city under such circumstances would have had power to ratify the payment of such excess, then the city would be precluded, it would seem, by having after the new charter come into power, with full knowledge, paid off the claims of the defendant South Knoxville Macadam Company, which included said excess. Certainly it should not now be allowed to complain of any action of the Chancellor in refusing to allow it to become a complainant to assert a right of recovery of its voluntary payment, without any sufficient explanation justifying its inconsistent attitude. It would seem also, if the City had any such right to thus ratify the previous transactions, it should therefore terminate the right of the taxpayers to further complain.

In the view we have taken of the case, however, it is not necessary for us to determine this question, except as it may appear a sufficient reason for overruling complainants' fourth assignment of error, which we do; and regarding which it is also sufficient to say, that the petition of the city to become a party complainant at the time was only denied for the present, with leave to renew the application. Such application never having been renewed, no final action was ever had thereon, and it must therefore be considered as having been abandoned.

We think any action on assignment number three is not very material. However, we sustain the same, and admit the evidence,

believing that the exception went more to its weight than to its competency.

As indicated, we do not think there is any merit in any of the other assignments of error, and they are therefore overruled. With the exception of the action of the Chancellor in excluding the evidence as indicated, his decree is affirmed, with costs against appellants and their bondsmen.

Portrum and Thompson, JJ., concur.